This memorandum opinion was not selected for publication in the New Mexico Reports. Please see Rule 12-405 NMRA for restrictions on the citation of unpublished memorandum opinions. Please also note that this electronic memorandum opinion may contain computer-generated errors or other deviations from the official paper version filed by the Court of Appeals and does not include the filing date.

# IN THE COURT OF APPEALS OF THE STATE OF NEW MEXICO

**STATE OF NEW MEXICO,**

Plaintiff-Appellant,

v. **NO. 31,066**

**JENNIFER WELLS,**

Defendant-Appellee.

**APPEAL FROM THE DISTRICT COURT OF BERNALILLO COUNTY**
**Albert S. "Pat" Murdoch, District Judge**

Gary K. King, Attorney General
Andrew S. Montgomery, Assistant Attorney General
Santa Fe, NM

for Appellant

Jacqueline L. Cooper, Chief Public Defender
Mary Barket, Assistant Appellate Defender
Santa Fe, NM

for Appellee

## MEMORANDUM OPINION

**VANZI, Judge.**

The State appeals the district court's grant of Defendant Jennifer Wells' motion to suppress evidence. We reverse.

**BACKGROUND**

Defendant was charged with criminal sexual contact of a minor, contributing to the delinquency of a minor, and child abuse for incidents that allegedly occurred in approximately October 2007 through December 2007. In February 2008, the alleged victim, N.P., underwent a safe house interview, which was videotaped. In addition to the interviewer, Detective Don Roberts of the Albuquerque Police Department was present and took detailed notes that he later incorporated into a police report.

For reasons not evident from the record, Defendant was not indicted until March 2010, over two years after the alleged incidents and the safe house interview. Defendant requested a copy of the safe house interview video and, upon being told that it could not be located, moved to suppress all evidence that the video could have been used to impeach. The district court granted the motion, specifically excluding any testimony by N.P. The State appeals this ruling pursuant to NMSA 1978, Section 39-3-3(B)(2) (1972).

**DISCUSSION**

Where the State loses or destroys evidence before trial, New Mexico applies a three part test, considering whether "[(1) t]he State either breached some duty or intentionally deprived the defendant of evidence; [(2) t]he improperly suppressed evidence [was] material; and [(3) t]he suppression of this evidence prejudiced the defendant." *State v. Chouinard*, 96 N.M. 658, 661, 634 P.2d 680, 683 (1981) (internal quotation marks and citation omitted). Where the loss of evidence is known prior to trial, there are two alternatives available to the district court: "Exclusion of all evidence which the lost evidence might have impeached, or admission with full disclosure of the loss and its relevance and import." *Id.* at 662, 634 P.2d at 684. "The choice between these alternatives must be made by the trial court, depending on its assessment of materiality and prejudice." *Id.*

In applying the *Chouinard* test, the district court found, with respect to the first factor, that the State had breached its duty to preserve the video. No one appears to assert that the loss was intentional. The district court also found that the video was material with respect to at least one aspect of the case, where N.P.'s statement on the video, apparently as discernible from Detective Roberts's notes, did not mention oral sex, while his grand jury testimony two years later did. The parties agree that the video would not have been admissible as substantive evidence against Defendant but that it could have been used to impeach the testimony of N.P. The district court found

that the loss of the video "severely prejudiced" the defense in its ability to cross-examine N.P.

We agree with the district court as to the first two *Chouinard* factors. No one disputes that the State breached its duty to preserve the video. Further, the evidence was material. "Whether evidence is material depends on if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *State v. Fero*, 107 N.M. 369, 371, 758 P.2d 783, 785 (1988) (internal quotation marks and citation omitted). Here, knowing whether there were inconsistencies in N.P.'s statements over time would inform a jury as to his credibility. Because the safe house interview, one of N.P.'s earliest statements as to what happened, provides the starting point against which his later statements can be compared, the absence of these statements would amount to loss of a potential source of reasonable doubt and would thus undermine confidence in the outcome. Accordingly, we agree that the video of these statements is material.

We disagree with the district court on the third *Chouinard* factor: whether Defendant was prejudiced. The present case resembles *State v. Bartlett*, 109 N.M. 679, 789 P.2d 627 (Ct. App. 1990), in relevant ways, and we conclude that *Bartlett* is dispositive. There, the victim of criminal sexual penetration was interviewed twice

4

and described her attacker on both occasions, but the state was unable to produce the tape of the first interview. *Id.* at 680, 789 P.2d at 628. The defendant argued that he needed the tape because the victim's initial description of her attacker, as outlined in a police report and in her preliminary hearing testimony, differed somewhat from her testimony at trial and the defendant's appearance at the time of trial. *Id.* at 681, 789 P.2d at 629. The jury did not reach a verdict at the defendant's first trial. *Id.* at 680, 789 P.2d at 628. The district court ordered the state to produce the missing tape prior to retrial, and when the state did not do so, the district court dismissed the case as a sanction for noncompliance. *Id.*

Reversing the district court in *Bartlett*, this Court began our analysis with the premise that "dismissal is an extreme sanction to be used only in exceptional cases." *Id.* We noted that the district court had expressed concern that the state had deliberately lost the evidence but "was not necessarily saying that had occurred in this case." *Id.* at 681, 789 P.2d at 629. We presumed for purposes of our analysis that "some degree of deliberate fault on the part of the state was present." *Id.* In *Bartlett*, we had the advantage of the transcript of the defendant's first trial, at which defense counsel had extensively cross-examined the victim regarding the variances in her descriptions of her attacker and had argued the significance of the missing tape. *Id.* at 681-82, 789 P.2d at 629-30. Thus, we were in a better position to conclude that the

missing tape was not so important to the defendant's case that its absence required dismissal. *Id.* at 682, 789 P.2d at 630.

We acknowledge some differences between *Bartlett* and the present case, but these do not change the result. Most significantly, as noted above, in *Bartlett* a trial had taken place and provided a basis for determining whether the defendant would be prejudiced upon retrial in his ability to cross-examine his accuser. Here, there has not yet been a trial, and it would be speculative on our part to predict what evidence would be admitted at trial, what arguments the parties would make, and most significantly, the probability that Defendant's access to the video would impeach N.P. more effectively than other bases for cross-examination still available to Defendant. We are not totally without a basis for analyzing prejudice, however. Even without the video, Defendant presently appears to have several means of accomplishing effective cross-examination. As noted above, Detective Roberts observed the safe house interview and took detailed notes that he later incorporated into a police report. Defendant points out that Detective Roberts was collecting information for the purpose of prosecuting her, not to create a defense for her. At the time of the safe house interview, however, the subsequent assertedly inconsistent statements by N.P. had obviously not yet taken place. For example, Detective Roberts' notes did not contain any allegation that oral sex had taken place, whereas N.P. alleged in his later

6

grand jury testimony that it had taken place. Assuming for the purposes of this analysis that Detective Roberts' safe house note taking reflected his goal of prosecuting Defendant, he would not likely have omitted any assertion by N.P. that oral sex had taken place, had N.P. made such an assertion at the time. Until Detective Roberts provides his testimony at trial, it would be speculative to assume that he will testify inconsistently with his previous notes from the safe house interview. Defendant's motion to suppress identifies four other inconsistent statements by N.P., including the number of times they had kissed, whether Defendant had shown him her breasts, the reason he entered a classroom where one of the alleged criminal acts took place, and whether he and Defendant were "going out" or he considered her a "friend." The fact that Defendant was able to identify these inconsistencies for purposes of her motion to suppress, suggests that she has access to much of the information she would need to cross-examine N.P. at trial. Presumably at trial she would also be able to cross-examine the safe house interviewer and Detective Roberts based on their recollections and Detective Roberts' notes. In the present case, the issue of actual prejudice should be assessed at trial when the testimony is no longer speculative, and the district court can make an informed decision similar to *Bartlett*.

Defendant correctly points out, as did the district court, that there are several other ways in which the video could potentially reveal aspects of the safe house

interview that are not discernible from the written notes. These include N.P.'s demeanor, the interviewer's style, and the possibility that suggestive questioning affected the process. While it would have been preferable to have the video available to Defendant, it remains speculative to presume these factors would have accrued to her benefit. Further, under one of the remedies for lost evidence specified in *Chouinard*, Defendant could argue that the State's failure to provide the video is a basis for reasonable doubt of Defendant's guilt. *See* 96 N.M. at 662, 634 P.2d at 684 (noting that one remedy available for the loss of evidence is "full disclosure of the loss and its relevance and import"). "Defendant's assertion of the possibility of prejudice, without more, is insufficient to establish actual prejudice." *State v. Jacobs*, 2000-NMSC-026, ¶ 46, 129 N.M. 448, 10 P.3d 127.

After outlining the procedure for addressing lost evidence, our Supreme Court in *Chouinard* concluded that "[t]he fundamental interest at stake is assurance that justice is done, both to the defendant and to the public." 96 N.M. at 662, 634 P.2d at 684. At this stage of the proceedings, we conclude that Defendant would not be sufficiently prejudiced by the loss of the safe house interview video because she has alternative sources from which to cross-examine N.P., and suppression of all evidence that could have been impeached by the video is improper at this time.

8

**CONCLUSION**

For the reasons stated above, we reverse the district court's grant of Defendant's motion to suppress and remand to the district court for further proceedings.

**IT IS SO ORDERED.**

_____
**LINDA M. VANZI, Judge**

**WE CONCUR:**

_____
**TIMOTHY L. GARCIA, Judge**

_____
**J. MILES HANISEE, Judge**

9